counsel. We appreciate your help as C.J. appointed. Thank you. I appreciate that. This case, there are actually two messages that were relied upon by the court in imposing the obstruction enhancement in this case. There's a February 24th message and there's a March 7th message. The February 24th message happened before trial. The March 7th message happened during trial. It appears from the government's briefing that they're not relying on the March 7th message as to enhance, but it did appear that the court relied on that message and some of the comments to that message, the Facebook posting on the 7th. But again, as I put in my brief, I think Galaviz and the First Amendment precludes the obstruction enhancement for the March 7th message as all those witnesses had already testified publicly. But to address the February 24th chirp that the government is relying on, this was a message to a friend. He was, the defendant in this case was using a chirper, like a texting machine from the jail, and he was speculating about who might testify in his trial. And he gave five names to his friend, and only two of them actually ended up testifying in the trial. That message doesn't contain any threat to those people, and it also doesn't contain any instruction to that person to publicize their names. I think it's important to draw a distinction between this Court's previous case law on the obstruction enhancement, where defendants had distributed information from the PSR or information from their discovery, which was governed by a court order not to disseminate. In this case, we have either publicly available information, a trial that's already happened and he's commenting on his trial, or we have him speculating a couple weeks before his trial about who might be testifying in his case. He indicates that some of them are in the jail, but he doesn't tell this person to threaten them, and application note for him to threaten them, but I, everything runs together in my mind, so I apologize if I'm wrong, but somewhere in the back of my head, I seem to be recalling that he did direct them to post it on Facebook. And what would be the point of posting it on Facebook if it's not an implied threat? Well, that's the March 7th message. Oh. So the March 7th message is they had, those people had already testified on March 5th and March 6th during his trial. It was really more of a comment on what had occurred in his trial. And also the March 7th message, I don't consider that to be a threat. He said, these are the people who traded my freedom for theirs. And those 13 witnesses had all testified that they accepted reductions in their sentences in order to testify against Mr. Brownbull. It's really kind of a true statement. It really wasn't, that wasn't a threat, and I think we also have to draw a very clear line between some of this Court's previous case law, like Brisbane, where they are threatening or attempting to disseminate PSR information, which is governed by a Court's order. If you could clarify for me, what's your view on what the district court relied on? Did it, was it, the March 7th was the post-testimony message, is that correct? And then there was an earlier one. What does the record say about what the district court was actually on the record relying on? It's not entirely clear. It's sort of a hybridization of the two posts, and I think they may have gotten it a little confused. It's kind of the Court's feel for what had happened, combining both. Is that a fair read? Yes, and the Court explicitly mentioned that people responding on Facebook, people commenting on that post had called those people rats, and And that was the March 7th post-testimony posting? Correct.  The Because I think that the analysis in the transcript, if I remember, is only a half page long or so on this. Is that correct? I mean, there wasn't much elaboration by the Court on what went into this enhancement. Yes. If, I don't even know, I think it's a half a page, correct. There is, on the February 24th message, he's indicating that he would like to fire his lawyer. He had been indicating that in all of the messages. He'd been wanting to fire his lawyer the entire relationship. So I don't believe that the attempt to fire his lawyer right before trial started was an attempt to delay or hinder the process at all. He had always wanted to do that. He does say in the February 24th message, I'm going to push my trial out, because he knows that if he's successful in firing his lawyer, his trial will get pushed out. And then he says, I'm going to make them move their snitches around. That might be what the Court ultimately was relying on, but it wasn't clear. I also don't think, though, that that would, I mean, that certainly doesn't meet Application Note 4a. It's not a threat. It's not an attempt to unlawfully influence a witness. He's really just saying what he knows will happen if his request to fire his lawyer is granted. The witnesses would be moved back to Federal prisons where they came from. So the February 24th message, it just does not appear to me that that could get to the obstruction enhancement, as broad as an obstruction enhancement can be. The Court in this instance did rely on Application Note 4a, which is either a threat or some attempt to unlawfully influence. Here's what the judge says, though, and I'm wondering if it's just, it's got to be clear error on the facts. What she says is that on the February 24th message, they're referred to as rats and effers, and the defendant makes it clear that they're snitchers. That's a whole tone of the post on February 24th is trying to put pressure on them, to move them around. All of that is an attempt to intimidate, trying to influence a witness, either directly or indirectly, or attempting to do so, which falls foul of Application Note 4. Now, if you look at it, there's mixed legal conclusions and facts there, but the fact finding in that appears to be that he's making these statements with an intent to intimidate or influence. He's going to do everything he can to have them move around and make them all appear and create as much inconvenience as possible as to put pressure on them, and that all of that then follows and falls into the rubric of what's prohibited under Application Note 4a. And so why are those findings of fact clearly erroneous? Because unfortunately, the judge in that finding conflated the two incidents, conflated the February 24th and the March 7th. Well, it kind of not, though, because her exact quote is, their names were identified on February 24th of 2004, before the trial began, which was March 5th. They're referred to, and it seems that everything that follows after that in the ordinary English language would actually relate back to the 24th. Well, and they're only, they weren't identified. Only two of the actual witnesses that testified were identified in the February 24th message of the 13. So no, they weren't actually all identified. There were only two. They're not threatened in the February 24th message. They're not called that. They're only threatened to be, I'm going to do everything I can to make them be moved around. And again, I think that when he says, I'm going to push my trial out, move the snitches around, he's just recounting what he knows will happen once he fires his lawyer, if he's successful in firing his lawyer.  But additionally, again, as broad as the obstruction of justice enhancement can be, I'm not sure that you could get there from maneuvering that way, particularly not with Application No. 4A, which requires a threat or an unlawful influence of a witness. Coaching a witness could suffice, but we don't have that here. It has to be somehow illicit or unlawful what you're doing. And Mr. Brownbill didn't do that in this case. And in particular, the February 24th messages, they're not public. That's not a Facebook posting. It's simply a conversation with a friend speculating about who he thinks might testify in this trial. And he's wrong about more than half. He names five names. Only two ultimately ended up testifying in the trial. You are in your rebuttal. Oh, that's fine. I don't think I'm going to need a whole lot of rebuttal here, Your Honor. Thank you. And then just if I could, even if the obstruction enhancement were reversed in this case, we still wouldn't get below the bottom of the guideline range, which is why I would also need the court to reverse the leader-organizer decision that the trial court made in this case. And again, for the reasons outlined in my brief, I don't believe that Mr. Brownbill was a leader-organizer. There were only two instances of what the court called fronting, and they were essentially two people stealing from him. He gave them drugs and they never paid him back. And we don't also additionally have, I think when the court said that he sets the prices for drugs, that's really just another way of saying you sold something. Anytime I sell something, I set the price for it. I think— Well, now, wait a minute. If you're in a, if you're telling a group what each of them should charge, that's a lot more like leadership than just buy-sell stuff. And I think that you're correct on that, Your Honor, but I just don't think you have evidence in this case from the transcript of him telling a group that. Thank you. Thank you. Ms. Rich, also double-duty. Yes, Your Honor. Good morning again. Thank you to the court. The district court's findings here supporting the obstruction enhancement were not clear error. There was no, respectively, there was no confusion by the district court in what it was relying on. At the sentencing hearing, the court heard testimony from an FBI agent who had also testified at trial about these jail chirps. And in Sentencing Exhibit No. 1 on page 2, the defendant refers to them as effers, as rats, as snitches, and identifies at least two people who did later testify at trial, and then specifically states his plan to interfere with them. I'm going to push my trial out, make them snip, ship they snitches back and forth. That is squarely within the application note 4A of threatening, intimidating, or otherwise unlawfully influencing a witness or attempting to do so. By moving them around in jails when they're back for no reason and have to provide, you know, they're in a jail environment where everyone's wondering why they're there. And so that is squarely within that prohibited conduct. And so there's just no error in the district court's analysis, having heard the FBI agent testimony, reviewed the evidence, presided over the entire trial. And the suggestion that the firing lawyer had nothing to do with that goes against his own jail chirps, that that was his plan. And he had a way where he was trying to force that to happen. Can you help me with the 3B1.1? I think, again, the district court's explanation was fairly brief, maybe for understandable reasons. But, you know, my general sense is that enhancement applies to those who direct others. And I'm speaking, you know, in general terms. And I'm wondering, there's just not a lot in the sentencing transcript record there. What did the district court rely on? And why is that legally sufficient for the lead organizer enhancement? So this district court who had listened to all of the testimony in trial and noted that, and then summarized, having heard 14 different witnesses at trial about the quantities of drugs people were receiving, controlling that, re-upping people, collecting unpaid debts, and then fronting to others. Yeah. And three of those things we say don't count, right? I mean, because they're not really supervising. They're just buyer-seller relationship. If you front, that's inherent. Setting the prices is inherent in selling. You know, the real question is the collecting of debts. And there the facts matter, right? I mean, because how you go about collecting the debts. If you direct somebody else to collect the debt, they don't do it. Then you intervene yourself, collect the debt yourself, you know, on behalf of the organization. There's direction in there. Now, what evidence was there in this record that in the collection of debts, because I think that's, I really think that's where this whole thing is going to turn on, is that what evidence is there that the defendant was directing others to collect those debts on behalf of the organization? Well, Your Honor, as the court said that three of these things don't count. On their own, they wouldn't. But together, the court noted these four things showed his role as this organizational leader. Well, what it could show is that he's the central source of supply. That's still just a buyer-seller kind of relationship, right? We've said that fronting gets away from, is not covered by the buyer-seller relation cases. Correct. If that's all there is. If it was just fronting, that's... That fronting is, refutes the notion that all we have is buyer-seller. Oh, correct. Yeah, yeah, on that defense. I didn't mean it like that. But what you've got is, it doesn't make you the supervisor, does it? Or do you think it does? I guess I can talk to you about that later. I think it comes pretty darn close. We may, I think we may have, I may have written that, but I'm not sure because I've certainly taken it out from under the buyer-seller exemptions. I think you did, Your Honor, and I can't find the case in my notes here. But here, Mr. More than one. I think so. But I don't remember if it was in a 3B1.1 context. I think this Court has taken it out if that, if fronting is all it is. But here, he had the recruitment of sub-distributors, Richard Belyuen, that was in KJ's testimony. Right, but the district court didn't, that's not in the sentencing transcript, right? Is that in the PSR? That is in the PSR. And it was, I don't have the PSR paragraph number, but it was in volume one of the trial transcript at page 37. Because I, and the problem there is the district court here, there were, there were multiple objections here, right, to the PSR, multiple objections. And the district court got around those objections by saying, I'm not going to rely, I'm not going to resolve these, but I'm also not going to rely on large sections of the PSR. Is that accurate? And what the district court, when you look at the PSR, the whole first section relied on the discovery, but the district court did make specific findings to the objections that were based on trial testimony. Right, and on the 3B1.1, though, it's, I mean, the closest I can get in the district court's record here is he controlled the quantity of drugs that other people received. He re-upped individuals that were selling on behalf of the conspiracy. He collected unpaid debts. He fronted meth. I mean, that's what I find in the record. And why is that enough? Well, sure. The district court was summarizing the evidence it had heard throughout the course of the whole trial that it presided over. And so that, I think this court can rely then on the trial record that the district court was summarizing in those findings. And is this a clear error review? It is, Your Honor. It is. And here we know that Mr. Brownville was recruiting accomplices, that Mr. Bedell-Yoon. FM testified that he basically provided protection while the defendant and Bedell-Yoon were breaking down a kilo. That goes to the controlling quantities that he was, the defendant was breaking it down from a kilo into smaller quantities. And then MP testified that she and the defendant were discussing on the Facebook messages in Exhibit 17D the pace of business, quantities, deals, arranging buys from the defendant. And so I think this court can look further into what the trial record is that the court was relying on in making those findings. So the PSR says the defendant's an organizer or leader or otherwise and simply says that the defendant was a source of supply for distributors, had several of his own sub-distributors, set prices, and traveled to obtain methamphetamine. Correct. And that was all in the trial testimony. Is that sufficient? Well, then typically the PSRs and the District of South Dakota, it does that and then that's basically a summary of what was included in the factual portions of the PSR. Was there an objection to the four level as opposed to three? The objection was just applying. There wasn't an alternative suggestion. Applying at all. It seems to me that you can't argue with it that it wasn't a three level. What we're debating here, does it get to directing others and so forth? Correct. I mean, everything that's been recited by you and by my colleagues, you can't dispute that's at least three levels. Correct. So often we have a fight over three versus four. That's not unusual. But was that fight framed in the district court? It was not. The defendant sort of made an all or nothing objection. Okay. And the district court did also make a finding that this was an extensive conspiracy having heard from 14 witnesses at trial about the nature of the conspiracy. So that was in the findings. I think when this court looked at its case law, Alexander, that the definition must be broadly construed, that the district court chose a permissible way of viewing the evidence and so that the factual findings here are not clearly erroneous. And then this court has also said in the Earl Meyer case at page 763 that the defendant really only has to lead at least one person in enlisting the aid of others. So the extent of that. Which person was it here then? Our position is that Mr. Bedelian was certainly one of those people and then also MP who was a testifying witness at trial. And so with that, we would ask this court to affirm that the factual findings by the district court were sufficient and were not clearly erroneous and that the case in its whole should be affirmed. Thank you. Thank you.